# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **THE UNITED COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00071 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JEFFREY J. KEENAN,** | ) | |
| | ) | |
| Defendant. | ) | By: PAMELA MEADE SARGENT |
| | ) | UNITED STATES MAGISTRATE JUDGE |

This case is currently before the court on the defendant's Motion to Exclude Expert Testimony, (Docket Item No. 75), ("Defendant's Motion to Exclude"), and the plaintiff's Motion to Exclude Expert Testimony, (Docket Item No. 77), ("Plaintiff's Motion to Exclude"), which were both filed on October 18, 2007. A hearing was held on these motions on November 13, 2007. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1332 and § 1441.

## I. Relevant Facts & Background

In October 2002, the plaintiff, The United Company, ("United"), hired the defendant, Jeffrey J. Keenan, to serve as its president and chief operating officer. (April 3, 2007, Deposition of James W. McGlothlin, ("McGlothlin Deposition"), at 50.) The parties concede that the initial agreement included a compensation package that provided a $420,000 annual salary and a $100,000 annual bonus, as well as an incentive bonus equal to five percent of the net increase in United's adjusted book

value.  James W. McGlothlin, the founder of United and one of its two shareholders, has consistently reiterated his contention that Keenan was aware that, when he was hired, United was seeking a minimum five-year commitment, and that Keenan would be eligible for the incentive bonus only if he fulfilled the commitment.  (McGlothlin Deposition at 49-50, 117.)  This alleged employment agreement was never reduced to writing.  McGlothlin acknowledged that neither the bonus calculation nor the compensation arrangements were put in writing, and explained that it was customary at United for executive employment agreements to not be in writing.  (McGlothlin Deposition at 57.)

In November 2003, Keenan notified McGlothlin that he intended to resign as United's president.  (November 18, 2003, Memorandum, ("Nov. 18 memo"), at 1.) McGlothlin expressed concern about Keenan's plan to resign.  Thus, the two parties agreed to meet in McGlothlin's office to discuss Keenan's future.  (McGlothlin Deposition at 120.)  What occurred at this meeting, including what, if any, agreement was reached is disputed, as McGlothlin contends that he made it clear that the incentive bonus was contingent upon Keenan remaining at United through 2007. (McGlothlin Deposition at 120-21.)  Eventually, Keenan agreed to remain at United, and United agreed to pay Keenan the incentive bonus.  Keenan was paid a $10 million incentive bonus in two installments.  (March 19, 2007, Deposition of Kenny Dockery, ("Dockery Deposition"), at 38.)  He was paid $2 million on December 26, 2003, and the remaining $8 million on January 23, 2004.  (Dockery Deposition at 38.)

In a memorandum dated June 20, 2005, Keenan informed McGlothlin that he intended to resign effective June 30, 2005.  The parties met on June 22, 2005, to discuss Keenan's decision.  McGlothlin claimed that he offered to fill in for Keenan

and suggested that Keenan take a leave of absence to deal with certain family medical concerns; however, Keenan indicated that his decision was final. (McGlothlin Deposition at 216-17.) Both parties agree that, after Keenan confirmed his decision to resign, McGlothlin asked Keenan to leave immediately. (McGlothlin Deposition at 219), (March 15, 2007 Deposition of Jeffrey J. Keenan, ("Keenan Deposition"), at 397.)

As a result of Keenan's resignation, United initiated this case in Virginia state court against Keenan seeking the repayment of the $10 million incentive bonus, as well as other incidental damages, based upon claims of breach of contract, promissory estoppel and unjust enrichment. Keenan removed the matter to this court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. On November 1, 2006, United filed a motion to amend its complaint, (Docket Item No. 20), ("First Motion to Amend"), which was granted by this court on November 2, 2006. (Docket Item No. 21.) In the amended complaint, United eliminated its promissory estoppel claim and added a quasi-contract claim. (Docket Item No. 22.) United's First Motion to Amend was unopposed by Keenan. On April 17, 2007, United filed a Second Motion to Amend, attempting to add claims for breach of fiduciary duty and constructive fraud to the complaint, in addition to factual allegations to support those claims. (Docket Item No. 32.) This court denied United's Second Motion to Amend on June 8, 2007. (Docket Item No. 46.) On June 20, 2007, Keenan filed motions for summary judgment with this court, (Docket Item Nos. 47 and 48), and the undersigned entered a Report and Recommendation as to those motions on October 12, 2007. (Docket Item No. 73.) By agreed order entered November 20, 2007, the parties have consented to transfer of jurisdiction over this matter to the undersigned, retroactive to October 11, 2007,

Case 1:06-cv-00071-PMS   Document 152   Filed 11/30/07   Page 3 of 43   Pageid#: 3324

pursuant to 28 U.S.C. § 636(c)(1). This order also converted the undersigned's Report and Recommendation to a Memorandum Opinion.

Currently before the court are cross-motions to exclude certain expert testimony. Keenan moves for the exclusion of the expert testimony of Robert J. Rock, United's proposed expert. (Defendant's Motion to Exclude.) Rock was retained by United to "review and analyze damages incurred by [United] related to [the] actions of [Keenan]." (Defendant's Memorandum in Support of Defendant's Motion), ("Defendant's Memo"), (Exhibit H at 1). Rock serves as the Managing Director at AlixPartners, LLP, and has been a Certified Public Accountant since 1978. (Defendant's Memo), (Exhibit H at 1.) In his preliminary expert report, dated May 23, 2007, Rock relied upon certain business records and documents, as well as relevant court documents, in making his assessment. (Defendant's Memo), (Exhibit H at 1-3.) In addition, Rock explained that, for the purposes of his report, United asked that he make the following assumptions:

> [t]hat the original incentive bonus arrangement agreed to between [United] and Mr. Keenan did not become due and payable until the later of December 31, 2007 or the termination of Mr. Keenan's employment . . . . That during his discussions with Mr. McGlothlin in late 2003, Mr. Keenan committed to remain with the Company through at least December 31, 2007. . . . But for Mr. Keenan's commitment to remain with the Company through at least December 31, 2007, [United] would not have paid Mr. Keenan the $10 million bonus . . . . [United] relied upon Mr. Keenan's commitment to remain with the Company and manage the day-to-day operations of the enterprise and, in his capacity as President, formulate and implement the business plan . . . . The business plan developed by Mr. Keenan for [United Coal Company] was based upon Mr. Keenan securing third party financing and implementing an effective exit strategy for [United] with a short horizon of approximately

-4-

18 months . . . . Mr. Keenan would have successfully obtained third party financing to substantially fund the working capital and investment needs of [United Coal Company].

(Defendant's Memo), (Exhibit H at 5.) Based on these assumptions, Rock opined that, if Keenan was found liable, not only had United incurred damages from the $10 million bonus payment, but that it also incurred other damages resulting from United's coal investments that totaled approximately $34 million, plus prejudgment interest. (Defendant's Memo), (Exhibit H at 5.)

Rock determined that United was entitled to repayment of the $10 million incentive bonus because "[b]oth parties understood that if Mr. Keenan left the employment of [United] early, that he would forego any incentive bonus since it was not [due until the later of five years or Mr. Keenan's departure]." (Defendant's Memo), (Exhibit H at 6.) He also noted that United viewed the $10 million payment as an advance to Keenan. (Defendant's Memo), (Exhibit H at 6.) He acknowledged that the payment was recognized as a compensation expense in 2003, but opined that the accounting treatment appeared to "have been governed more by tax considerations than the substance of the transaction." (Defendant's Memo), (Exhibit H at 6.) Rock opined that "[t]he fact that amounts were paid and that the bonus was recognized as income by Mr. Keenan, should not affect how [United Coal] accounted for the economic substance of the transaction." (Defendant's Memo), (Exhibit H at 6.) Additionally, Rock stated that it was his understanding that "it is not uncommon for [United] to enter into oral agreements or 'hand shake' deals in the ordinary course of conducting business." (Defendant's Memo), (Exhibit H at 6.) Based on his personal experience, he offered the opinion that "it is not unusual or uncommon for entrepreneurs to conduct their affairs" in that manner. (Defendant's Memo), (Exhibit

-5-

H at 6.)

With regard to the additional damages, Rock noted that, based upon his understanding of the facts, McGlothlin would not have authorized the issuance of an equity interest in a new business venture or authorized the investments to re-enter the coal business had he known that Keenan did not intend to remain with United for the entire five-year period. (Defendant's Memo), (Exhibit H at 7.) Rock explained that, at the time of Keenan's resignation, United had made several investments in the coal industry by purchasing mining properties, providing funds to assist in the operation of those properties, purchasing mining equipment and hiring a new management team to oversee its mining operations. (Defendant's Memo), (Exhibit H at 7.) Rock stated that, following Keenan's resignation, United decided that its best strategy for minimizing losses would be to continue its re-entry into the coal business by following the business plan set forth by Keenan. (Defendant's Memo), (Exhibit H at 7.) Furthermore, Rock found that United Coal intended to raise significant equity to support the needs of its coal operations. (Defendant's Memo), (Exhibit H at 7.) Rock reported that McGlothlin expected only a limited investment by United into United Coal; however, he explained that, since Keenan's resignation, "other than an investment by business acquaintances of [United] in late 2005, [United Coal] has been unable to secure and maintain sufficient third party financing and has been forced to principally rely upon [United] to fund its ongoing working capital needs." (Defendant's Memo), (Exhibit H at 7.)

Rock opined that Keenan's experience and skill in financial matters were unique, and that his resignation thereby "limited [United Coal's] ability to implement the

-6-

business plan effectively, as it lacked the expertise to identify, evaluate, and effectively implement strategic alternatives." (Defendant's Memo), (Exhibit H at 7.) Likewise, he opined that Keenan's departure "significantly hindered [United Coal's] ability to access the capital markets to obtain the financing necessary to fund operations." (Defendant's Memo), (Exhibit H at 7.) Because United Coal could not find alternative sources of funding, United was forced to "contribute capital in amounts far in excess of its original plan to fund ongoing operations in an attempt to preserve value." (Defendant's Memo), (Exhibit H at 7-8.) Rock noted United's contention that, had Keenan remained as its president, he would have been able to successfully obtain appropriate third-party financing that would have, in turn, limited the need for investments by United, thereby reducing the losses that United has incurred. (Defendant's Memo), (Exhibit H at 8.) Rock determined that because United was forced to invest significant amounts, "[United] has been damaged to the extent that the face value of [United's] loans to [United Coal] is greater than the consideration United can expect to receive from the sale of the enterprise." (Defendant's Memo), (Exhibit H at 8.)

Rock reported that, as of March 31, 2007, United Coal's consolidated financial statements indicated a cumulative retained deficit of $91.9 million and a negative shareholder equity of approximately $24 million. (Defendant's Memo), (Exhibit H at 8.) Moreover, as of March 31, 2007, United had advanced $159.8 million in debt and $35.9 million in equity to fund United Coal's operating and investing activities. (Defendant's Memo), (Exhibit H at 8.) In the process of conducting the preliminary report, Rock was informed by McGlothlin that United Coal had received a proposal to purchase its net assets, in which it would receive $50 million in cash and $160 million

-7-

in equity. (Defendant's Memo), (Exhibit H at 8.) Rock noted that, as of March 31, 2007, United Coal had an outstanding debt of approximately $291.7 million, with $159.8 million of the debt related to loans owed to United. (Defendant's Memo), (Exhibit H at 8.) Rock found that "[i]f these proceeds were distributed based upon the relative debt priorities as of March 31, 2007, the value of the proposed consideration allocable to [United] would have totaled approximately $125 million." (Defendant's Memo), (Exhibit H at 8.) Thus, he determined that since the amount allocable to United was less than the face value of United Coal's outstanding debt to United, the additional damages totaled approximately $34 million. (Defendant's Memo), (Exhibit H at 8.)

Rock was deposed on June 14, 2007. On deposition, Rock acknowledged that he had never performed any consulting work in connection with the coal industry. (June 14, 2007, Deposition of Robert J. Rock, ("Rock Deposition"), at 18.) Rock also acknowledged that, prior to rendering his report, he had not been furnished with a copy of a report prepared by a company employed by United that set forth purported offers United received for United Coal. (Rock Deposition at 38.) He indicated that he did receive a copy of the report after his initial report was completed, but noted that it did not "cause [him] to change [his report.]" (Rock Deposition at 38.) Rock stated that he did not speak with any employee of United Coal or conduct a site visit of United Coal's facilities and operations for the purposes of his report. (Rock Deposition at 43-44.) Likewise, he testified that he did not recall examining any information relating to the coal industry while preparing his report, other than certain reports from industry consultants that were provided by United. (Rock Deposition at 44.) He mentioned that he did not independently research information relating to the coal industry. (Rock

Deposition at 44.)

Rock was questioned regarding the assumptions used in his expert report. (Rock Deposition at 58.) Specifically, he was asked whether he believed that it was "a realistic assumption that Mr. Keenan would have been able to successfully obtain third-party financing to substantially fund whatever the working capital investment needs of United were." (Rock Deposition at 58.) Rock testified that it was a reasonable assumption, but explained that he had "not gone out to independently verify it beyond the steps that [he had] done . . . which [was] to read the record and read all the information . . . provided." (Rock Deposition at 59.) He opined that there was support within the information provided to indicate that the assumption was reasonable, and then noted "[s]o I'm not independently opining on any of these assumptions. That's why they're assumptions." (Rock Deposition at 59.)

Rock explained that the $210 million value used in his report was based upon certain negotiations that involved the potential sale of United Coal. (Rock Deposition at 99.) In arriving at his damages calculation, Rock stated that he compared the value of United Coal "to what amount of that [$]210 million would flow to [United]" and found that all of the $210 million would not directly flow to United. (Rock Deposition at 99.) He referred to this methodology as a "waterfall analysis" that was based upon "the priority of payment and/or allocation amongst a number of unsecured parties as to how those payments would be distributed." (Rock Deposition at 99.) Rock noted that the purported $210 million offer was not a final agreement, but opined that "those things tend to go down." (Rock Deposition at 99.) Continuing, Rock felt that using the $210 million offer as a value of United Coal was a conservative number, noting

-9-

that the lower the value of United Coal, the greater the damages. (Rock Deposition at 100.)

Rock testified that the ability to obtain third-party financing would be dependent, in part, on how well United Coal performed in its coal production abilities. (Rock Deposition at 111.) In addition, he also acknowledged that the coal market would be a crucial factor in obtaining financing and successfully performing an exit strategy. (Rock Deposition at 111-12.) Rock testified that market value is determined "on the basis of a willing buyer and a willing seller." (Rock Deposition at 159.) He explained that, in this case, he examined offers ranging from $200-220 million. (Rock Deposition at 160.) Thus, he opined that the $210 million value he placed upon United Coal was an appropriate amount. (Rock Deposition at 160.) Rock stated, "I'm using what I believe are real offers from real buyers who are willing to close the deal." (Rock Deposition at 170.)

Keenan's counsel then referenced three accepted methods of business valuation and asked Rock whether any of those methods could have been applied in this case. (Rock Deposition at 170.) Rock responded, "if you want to give [the methods] to me one by one, I'm happy to listen to them and then I will give you my view on whether it could have been used or whether it's not very useful." (Rock Deposition at 170-71.) First, Rock was asked about the income-based approach. (Rock Deposition at 171.) Rock referred to this approach as the discounted cash flow model and explained that it is used to estimate fair market value. (Rock Deposition at 171.) Rock stated, that instead of using a spreadsheet analysis performed by someone "separate and apart from the real world[,]" he felt that, in this case, "where we have offers by real buyers that

-10-

are able to close with marketability period and such[,]" it was more appropriate to apply the analysis he employed. (Rock Deposition at 171-72.) Next, Rock was questioned regarding the asset-based approach. (Rock Deposition at 172.) Rock described this method as an attempt to understand the value of a company's assets by "subtracting the obligations assumed." (Rock Deposition at 172.) Rock also rejected the use of this approach because the offers for United Coal that he had examined were significantly different than the appraisal information that was provided. (Rock Deposition at 172-73.) He opined that this information did not present a good indication of what a willing buyer would pay. (Rock Deposition at 173.) Rock also was asked about the market-based approach. (Rock Deposition at 173.) He indicated that this approach utilized "a multiple of EBITDA[1] or multiple of cash flow based upon transactions that have occurred, usually within the industry relatively recent time[-]frame of publicly-traded companies." (Rock Deposition at 173.) Rock rejected this approach because, in this case, there were "actual negotiations and offers by real parties that [were] able to close the transaction." (Rock Deposition at 173-74.) Therefore, instead of examining multiples, Rock believed the negotiations between the parties provided better evidence of value. (Rock Deposition at 174.) Rock recognized that examining the value of comparable coal companies would have been a good indication of value, but he reiterated that the information he considered was more on point "because [he] had real offers from real people and real companies with real money." (Rock Deposition at 174.)

With regard to Keenan's experts, United seeks to exclude the proposed expert testimony of Alan Johnson, Seth Schwartz and Thorn McDaniel. Alan M. Johnson of

---

[1] EBITDA refers to earnings before interest, taxes, depreciation and amortization.

Johnson Associates, Inc., was retained by Keenan as an executive compensation expert and provided an expert report dated April 23, 2007. (Plaintiff's Memorandum in Support of Plaintiff's Motion), ("Plaintiff's Memo"), (Exhibit 3.) Johnson indicated that throughout his career he has consulted with "major companies on a wide variety of compensation issues, norms, practices, and competitive levels." (Plaintiff's Memo), (Exhibit 3 at 2.) Johnson noted that United contends that the November 2003 oral agreement stipulated that the $10 million incentive bonus would be forfeited if Keenan's employment ended prior to the alleged five-year commitment. (Plaintiff's Memo), (Exhibit 3 at 3.) Johnson opined that "it would be extremely unusual and unprecedented for a [c]ompany to attempt to recoup such a paid bonus based on continued future employment, let alone without documentation." (Plaintiff's Memo), (Exhibit 3 at 3.) He further explained that this type of conduct would be contrary to customary and accepted practices used by companies of similar size. (Plaintiff's Memo), (Exhibit 3 at 3.) In addition, Johnson stated that when companies use deferred compensation to retain employees, and "delay/stagger the delivery of pay to insure retention," the agreements are "almost always in writing." (Plaintiff's Memo), (Exhibit 3 at 3.)

Johnson opined that this situation is "even more problematic" because United is in possession of no writing that documents its alleged arrangement with Keenan. (Plaintiff's Memo), (Exhibit 3 at 4.) He explained that nearly all companies that utilize significant deferral arrangements set forth program specifics, "such as what would happen upon a termination by the Company not for cause, a termination for cause and definition, disability, death, sale of the company, constructive termination, etc." (Plaintiff's Memo), (Exhibit 3 at 4.) Johnson suggested that United was aware of this

-12-

customary practice because it had previously used a company-wide deferred bonus program for its executives. (Plaintiff's Memo), (Exhibit 3 at 4.) Johnson found that "it would be unreasonable to require a minimum employment period as being attached to forfeiture of significant previously earned compensation, without such arrangement being documented in writing with adequate protections and details being specified." (Plaintiff's Memo), (Exhibit 3 at 4.)

Johnson noted that a five percent incentive bonus for a president of a medium-sized organization was normal. (Plaintiff's Memo), (Exhibit 3 at 4.) He also explained that it is common in the United States for executives and employees to voluntarily terminate their employment. (Plaintiff's Memo), (Exhibit 3 at 4.) Continuing, Johnson opined that "it is a well established practice and norm that executives have the right to terminate employment voluntarily, and not be held accountable for hypothetical losses after their departures." (Plaintiff's Memo), (Exhibit 3 at 5.) Furthermore, Johnson said that if United had intended its reentry into the coal industry to be dependent on Keenan's continued employment, it certainly should have placed such an "extraordinary expectation" in writing, detailing the expectations and consequences for both interested parties. (Plaintiff's Memo), (Exhibit 3 at 5.)

On July 6, 2007, Johnson provided a supplemental expert report. (Plaintiff's Memo), (Exhibit 4.) This particular report was in response to the testimony and documents of Rock, United's proposed expert. Johnson acknowledged that Rock and Dockery, United's chief financial officer, ("CFO"), had both testified that Keenan's incentive bonus would not be payable "until the later of five years from the date of his hire or the time of his departure." (Plaintiff's Memo), (Exhibit 4 at 3.) Johnson opined

-13-

that "such an arrangement is contrary to customary and accepted pay practices used by companies to retain employees and senior executives for the long-term." (Plaintiff's Memo), (Exhibit 4 at 3.) Johnson also noted that United did not place a requirement for remaining at United for a certain period of time on other executives in order for them to retain their bonuses. (Plaintiff's Memo), (Exhibit 4 at 3.) That fact, in addition to the fact that, for tax purposes, United deducted Keenan's bonus in 2003, "is inconsistent with United's position that Mr. Keenan's bonus was forfeitable in the future or intended to be advance compensation for future performance." (Plaintiff's Memo), (Exhibit 4 at 3.) Johnson recognized that United had stated Keenan was "uniquely qualified to lead, direct, and implement the strategic and financial decisions impacting United's new coal business." (Plaintiff's Memo), (Exhibit 4 at 3.) United claimed that it relied on those skills and abilities to expand its investment into the coal business. (Plaintiff's Memo), (Exhibit 4 at 3.) In Johnson's opinion, United was unreasonable in investing hundreds of millions of dollars in the coal business based on the assumption or reliance that Keenan would remain employed at United for a minimum of five years. (Plaintiff's Memo), (Exhibit 4 at 3.) Once again, Johnson opined that United should have documented the agreement in writing, detailing the expectations and consequences for both interested parties. (Plaintiff's Memo), (Exhibit 4 at 3.) Lastly, he reiterated his opinion that it is not a customary or accepted practice for companies to utilize oral deferred compensation arrangements in order to retain employees. (Plaintiff's Memo), (Exhibit 4 at 3.)

On October 10, 2007, Johnson was deposed. On deposition, Johnson indicated that some of his clients were private companies, but explained that the majority of his typical clients were "[u]sually large public companies." (October 10, 2007, Deposition

-14-

of Alan M. Johnson, ("Johnson Deposition"), at 43.) In describing his work with private companies, he testified that he provides services relating to "executive compensation from the bonus plans, contracts, equity awards, severance, base salaries, the whole range of executive pay." (Johnson Deposition at 45.) Johnson further explained that the majority of his clients are in the financial services community. (Johnson Deposition at 46.) Johnson testified that the advice he typically provides to his clients involves many issues, including amounts of compensation, the design of compensation programs, bonus programs, executive agreements and contracts, as well as base salary structures, non-compete plans and equity plans. (Johnson Deposition at 49.)

Johnson referenced the alleged agreement between United and Keenan. In particular, Johnson addressed the reasonableness of a significant monetary payment to an individual "with no documentation and alleged terms that are very one[-]side[ed] or potentially punitive." (Johnson Deposition at 65.) Johnson clearly questioned the alleged agreement by stating, "when you take all this together, is it either reasonable or even plausible that what is alleged happened here actually transpired [?] That the $10 million payment would be made with no documentation, no protections, incomplete or nonexistent communication, is that even plausible or reasonable or even credible [?]" (Johnson Deposition at 66.) Furthermore, Johnson confirmed the opinions expressed in his expert reports and stated that most bonus plans, including annual incentives, are typically in writing. (Johnson Deposition at 91.) Johnson stated that an important issue was the freedom of an executive to terminate his or her employment and whether it is a standard practice to hold the executive accountable for losses that occur after his or her departure. (Johnson Deposition at 65-66.) In addition,

-15-

Johnson once again opined that it was not "reasonable to spend hundreds of millions of dollars on the assumption" that Keenan would not leave the company. (Johnson Deposition at 68.) With regard to United's attempt to recover the $10 million payment, Johnson testified that, in his experience, it would be "extraordinarily unusual" for a company to make a large payment to an employee and then seek recovery of that payment if the employee were to leave the company. (Johnson Deposition at 75.)

On April 23, 2007, Seth Schwartz, a principal in the consulting firm of Energy Ventures Analysis, Inc., offered an expert report on behalf of Keenan. (Defendant's Memorandum in Opposition to Plaintiff's Motion), ("Defendant's Brief in Opposition"), (Exhibit E at 1.) For more than 25 years, Schwartz has specialized in work relating to the coal industry. (Defendant's Brief in Opposition), (Exhibit E at 1.) Schwartz acknowledged that United's damages theory was based on operating inefficiencies of the mining properties, inability to obtain financing following Keenan's departure and the fact that United had been unable to sell its coal mining business. (Defendant's Brief in Opposition), (Exhibit E at 1.) Schwartz opined that "there is no relationship between United's damages claim and Mr. Keenan's departure." (Defendant's Brief in Opposition), (Exhibit E at 3.) Schwartz stated that United's claim that it had no choice but to advance the funds to acquire the additional mining properties is incorrect. He explained that McGlothlin and United's other main shareholder reserved the power to approve or not approve any monies advanced to United Coal. (Defendant's Brief in Opposition), (Exhibit E at 3.)

Schwartz also noted that there is no indication of what role Keenan would have

-16-

played in the decision to purchase the additional mining properties, which occurred after his departure. (Defendant's Brief in Opposition), (Exhibit E at 4.) Schwartz recognized that United had highly qualified personnel in place to oversee its coal operations, including Michael Zervos and his management team, as well as McGlothlin, who likely has as much knowledge of the coal business as anyone within the Appalachian coal industry. (Defendant's Brief in Opposition), (Exhibit E at 4.) Thus, Schwartz seemed to imply that the decision to purchase the additional mining properties may not have included Keenan, even if he had remained at United.

Schwartz also opined that Dockery erroneously calculated United's damages. (Defendant's Brief in Opposition), (Exhibit E at 4.) In his opinion, Dockery double-counted the losses related to corporate overhead, included damages that have not been realized by United and included damages that were largely based on United Coal's payment to United itself. (Defendant's Brief in Opposition), (Exhibit E at 4.) Schwartz also noted that United's own projections indicate that the earnings from its coal investment will improve; thus, if that happens, United's damages claim could be significantly reduced or even eliminated if those investments become profitable. (Defendant's Brief in Opposition), (Exhibit E at 4.)

Moreover, Schwartz found that there is no reason to believe that Keenan's presence or absence is related to any lost money from United's coal investments. (Defendant's Brief in Opposition), (Exhibit E at 4.) Instead, he indicated that any problems faced by United and United Coal are directly related to the coal market and the value of coal investments. (Defendant's Brief in Opposition), (Exhibit E at 5.) Schwartz is of the opinion that Keenan's departure did not cause the alleged damages,

-17-

and his presence would not have prevented them. (Defendant's Brief in Opposition), (Exhibit E at 5.) Furthermore, he opined that the losses were "caused by a combination of lower coal production, lower sales prices, and higher production costs compared to budget." (Defendant's Brief in Opposition), (Exhibit E at 5.) Schwartz attributed these losses to execution and overall market conditions, which he felt Keenan could not have prevented. (Defendant's Brief in Opposition), (Exhibit E at 5.) In conclusion, Schwartz determined that, to a reasonable degree of certainty, "United's claim for consequential damages attributed to its coal mining business from Mr. Keenan's departure is speculative and completely unsupportable as a matter of causation." (Defendant's Brief in Opposition), (Exhibit E at 5.)

Keenan also offered the supplemental expert report of Schwartz, dated July 3, 2007. His supplemental report was provided in response to "new theories of damages propounded by [United] and its expert witness, Mr. Rock." (Plaintiff's Memo), (Exhibit 6 at 1.) Schwartz opined that Rock's method of calculating consequential damages was not valid and failed to measure the consequence of Keenan's departure. Schwartz noted that United has not attempted to ascertain what would have happened to its investments had Keenan remained with the company. (Plaintiff's Memo), (Exhibit 6 at 3.) He stated that United, in assessing its damages, has assumed that, if Keenan had remained with United, United would have made the same investments in the coal business, and that Keenan would have been able to successfully replace United Coal's debt to United with third-party financing. (Plaintiff's Memo), (Exhibit 6 at 3.) Schwartz opined that no one knows what Keenan's presence would have meant and whether the results would have been favorable. (Plaintiff's Memo), (Exhibit 6 at 3-4.)

-18-

Schwartz mentioned United's contention that it chose to mitigate damages from Keenan's resignation by continuing forward with the business plan that Keenan had implemented. (Plaintiff's Memo), (Exhibit 6 at 4.) However, Schwartz determined that United failed to properly mitigate damages because it did not make an effort to hire an executive capable of replacing Keenan. (Plaintiff's Memo), (Exhibit 6 at 4.) Schwartz also noted that "[i]nstead of mitigating, or minimizing [United's] losses in its coal investment, [United] embarked on a strategy to dramatically increase its investment in the coal industry, in hopes that it would make large sums of money." (Plaintiff's Memo), (Exhibit 6 at 4.) As such, Schwartz opined that United "does not have the right to invest however much money that it wants after the alleged breach . . . and charged Mr. Keenan with the losses from investments for which he had no involvement by calling it mitigation." (Plaintiff's Memo), (Exhibit 6 at 4.)

Schwartz determined that United Coal's operating losses were directly related to factors within the coal market and United Coal's failure to meet certain operating forecasts. (Plaintiff's Memo), (Exhibit 6 at 5.) He concluded that United Coal's losses were caused by a combination of lower coal production, lower sales prices and higher production costs compared to budget, which he attributed to execution problems and coal market conditions. (Plaintiff's Memo), (Exhibit 6 at 6.)

In his supplemental report, Schwartz also found that United's valuation of United Coal was flawed. Rock relied upon a proposal to purchase United Coal's net assets at a price of $50 million in cash and $160 million in equity to another subsidiary of United. (Plaintiff's Memo), (Exhibit 6 at 6.) However, Schwartz pointed out that

-19-

United had not actually attempted to put United Coal up for sale. Instead, as explained by Schwartz, United attempted "to structure a transaction in which [United] would purchase a large publicly-traded Central Appalachia coal company . . . in conjunction with a private equity fund." (Plaintiff's Memo), (Exhibit 6 at 6.) Thus, he determined that United's value of United Coal was "established by the interested private equity fund as [United's] contribution to the transaction." (Plaintiff's Memo), (Exhibit 6 at 6-7.) He opined that this was not an attempt to sell United Coal for its highest value and that it was not a true reflection of United Coal's fair market value. (Plaintiff's Memo), (Exhibit 6 at 7.) Additionally, Schwartz explained that, in placing a value on United Coal, Rock did not even consider other proposals that would have placed a higher value on the company. Thus, Schwartz opined that because United had rejected those offers as inadequate, it "obviously believes that its investment is worth more than th[o]se amounts." (Plaintiff's Memo), (Exhibit 6 at 7.)

Schwartz added that Rock failed to follow any of the generally-accepted methods for valuing a company. (Plaintiff's Memo), (Exhibit 6 at 7.) Schwartz stated that United's own advisors, Greenhill Capital, had provided a reasonable approach for valuing United Coal by examining multiples of projected earnings and the prices of comparable transactions. (Plaintiff's Memo), (Exhibit 6 at 7.) Using these methods, United Coal would be valued at $600-900 million. (Plaintiff's Memo), (Exhibit 6 at 8.) Schwartz concluded that, "[b]ased on [United Coal's] own financial forecasts and market valuations provided by [United's] own advisors, it is clear that the market value of [United Coal] is greater than [United's investment, and there are no damages, using [United's] damage methodology." (Plaintiff's Memo), (Exhibit 6 at 8.) Further, Schwartz stated that Rock ignored an independent valuation prepared by Marshall

-20-

Miller & Associates that valued United Coal at approximately $300 million using the discounted cash flow method. (Plaintiff's Memo), (Exhibit 6 at 8.)

Schwartz opined that the losses incurred by United Coal were directly related to the events that impacted the coal market and the value of coal investments. He explained that prices for coal in Central Appalachia "increased dramatically in the first quarter of 2004." (Plaintiff's Memo), (Exhibit 6 at 9.) This dramatic change was due to the shortage of coal on the international market. (Plaintiff's Memo), (Exhibit 6 at 9.) Schwartz noted that "[t]he market price for Central Appalachia steam coal rose sharply from December 2003 through April 2004, when [United] made its first investment in Sapphire Coal." (Plaintiff's Memo), (Exhibit 6 at 9.) He indicated that the market prices fell steadily during 2006 due to an increased coal supply in response to high prices and a decline in demand for United States coal. (Plaintiff's Memo), (Exhibit 6 at 9.)

Schwartz opined that United's business strategy to reenter the coal business was not unusual, as it was attempted by numerous investors during the same time period. (Plaintiff's Memo), (Exhibit 6 at 9.) He explained that successful execution of this strategy was dependant upon taking the coal company public while coal prices remained high. (Plaintiff's Memo), (Exhibit 6 at 10.) Schwartz reported that

> [s]tock prices for public Central Appalachia coal companies peaked in September 2005 and fell sharply in the first half of 2006, along with the fall in coal market prices. As a result, the ability to take a Central Appalachia coal company public had disappeared by early 2006, and none of the remaining companies could employ this exit strategy, including [United Coal].

(Plaintiff's Memo), (Exhibit 6 at 11.)  Schwartz concluded that "to a reasonable degree of certainty [United's] claim for consequential damages . . . is speculative and unsupported."  (Plaintiff's Memo), (Exhibit 6 at 11.)

On October 16, 2007, Schwartz was deposed.  Schwartz testified that his company provides special reports relating to the coal market to clients on a regular basis.  (October 16, 2007, Deposition of Seth Schwartz, ("Schwartz Deposition"), at 25.)  Schwartz explained that his responsibilities include cover analyses for clients in the coal and electric industries.  (Schwartz Deposition at 26.)  Moreover, Schwartz stated that he advises clients as to the coal market and also represents clients in the purchase or sale of coal properties.  (Schwartz Deposition at 27.)  Schwartz further explained that he is very experienced in valuing coal properties.  (Schwartz Deposition at 28.)  He testified that, while he did not prepare a formal valuation of United Coal in this case, he did review material related to United's financial condition and budget, which allowed him to arrive at certain opinions as to United Coal's value.  (Schwartz Deposition at 28-29.)  Schwartz recognized that he was qualified to perform a valuation of United Coal, but he commented that he was not asked to perform that task.  (Schwartz Deposition at 29.)  Schwartz testified that there are certain components within the evidence in this case that create an increase in the value of United Coal.  (Schwartz Deposition at 239.)  He opined that Rock's analysis failed to consider several of these relevant components.  (Schwartz Deposition at 239.)  Schwartz testified that, according to certain methodologies that are based upon the value of coal production per ton, United Coal could be valued at $375 - 900 million.  (Schwartz Deposition at 240.)  Schwartz noted that, in his experience, such a large valuation range is very useful because it allows one to view the lowest value versus the highest value for higher

-22-

qualities of coal. (Schwartz Deposition at 240-41.) Schwartz stated that, depending upon the type of coal that is produced and the quality of the properties, the value can vary greatly. (Schwartz Deposition at 241.) He opined that the value of United Coal's operations was above average for the Central Appalachian region because of the quality of the coal that is mined at its facilities. (Schwartz Deposition at 242.)

Schwartz further criticized Rock's analysis and stated that he was not aware of anyone who "would blatantly ignore all of the commonly accepted [valuation] methods in order to come up with a different conclusion which suited him such as this." (Schwartz Deposition at 244.) He indicated that Rock ignored the accepted valuation methods because he did not want to see the results they would yield. (Schwartz Deposition at 244.)

Keenan also offered the expert opinion of G. Thorn McDaniel III, who provided an expert report dated April 20, 2007. (Plaintiff's Memo), (Exhibit 8.) McDaniel has been a principal and consultant with Stosch, Dacey & George, P.C., since 1997, where he specializes in litigation support and forensic accounting, including financial investigations, civil and criminal frauds, insurance claims and the computation of economic damages in personal and corporate litigation. (Plaintiff's Memo), (Exhibit 8.) McDaniel's report provided an evaluation of United's alleged losses. McDaniel opined that "United's tax and accounting treatment of the $10 million in bonus payments to Keenan supports the position that the payments were made for Keenan and United's performance during calendar year 2003." (Plaintiff's Memo), (Exhibit 8 at 1.) McDaniel explained that, "as an employee, Keenan would file his tax returns on a cash basis and income would be reportable in the year received." (Plaintiff's Memo),

-23-

(Exhibit 8 at 1.)  He noted that Keenan's two bonus payments were reportable for tax purposes in the year received, and that Keenan properly reported each bonus payment. (Plaintiff's Memo), (Exhibit 8 at 1.)  For United, "the payments would be deductible in the year paid[,] only if the payments were made for services received in the year paid." (Plaintiff's Memo), (Exhibit 8 at 2.)  United deducted the payments in 2003, and United's CFO stated that the payments were deducted in 2003 because that was "'when the liability had been fixed and that when the economic performance occurred.'" (Plaintiff's Memo), (Exhibit 8 at 2.)  McDaniel concluded that "United's accounting and tax treatment of the bonus payments supports Keenan's position that they were for operating results/services performed in 2003 and not for future services/performance/employment." (Plaintiff's Memo), (Exhibit 8 at 2.) Furthermore, McDaniel explained that if United's assertion is true, and the incentive bonus payments were in exchange for his promise to remain employed at United through 2007, "then such payments should not have been deducted in total but rather treated as a prepaid expense to be amortized over the five-year period for which such services (performance) was required." (Plaintiff's Memo), (Exhibit 8 at 3.)  In fact, McDaniel noted that United's treatment of the payments resulted in total tax savings of more than $400,000.  (Plaintiff's Memo), (Exhibit 8 at 3.)

McDaniel also provided a supplemental expert report.  (Plaintiff's Memo), (Exhibit 9.)  In his supplemental report, McDaniel stated that "there has been no evidence submitted that supports United's contention that Keenan is responsible for a 'hypothetical' loss that might occur if [United Coal] is sold at a 'hypothetical' price to a 'hypothetical' buyer that would not cover all of [United Coal's] current outstanding debt to United."  (Plaintiff's Memo), (Exhibit 9 at 2.)  In addition, McDaniel reported

-24-

that United's damages claim includes "hypothetical sale losses resulting from operations and decreases in market value." (Plaintiff's Memo), (Exhibit 9 at 2.) However, McDaniel opined that United has not produced evidence to show that Keenan could have successfully obtained other sources of debt and/or equity financing. (Plaintiff's Memo), (Exhibit 9 at 2.) McDaniel also pointed out that, since Keenan's resignation, United has not hired a replacement and that United refused Keenan's offer to return to the company. (Plaintiff's Memo), (Exhibit 9 at 2.)

In criticizing the expert report of Rock, McDaniel noted that Rock's computation of damages essentially "holds Keenan accountable for all of United's loans (debt) to [United Coal] that [are] not covered by a hypothetical sale of [United Coal]." (Plaintiff's Memo), (Exhibit 9 at 2.) McDaniel observed that Rock's opinions were based upon assumptions set forth by United, and not based upon his own analysis of the situation. In particular, McDaniel stated that no adjustments were made to account for declining coal prices and failure to meet production goals. (Plaintiff's Memo), (Exhibit 9 at 2.) McDaniel asserted that Rock's contention was that Keenan should be responsible for approximately $34 million in damages, despite the fact that United would continue to own United Coal and be the beneficiary of a possible future sale, which could be at a higher value than the one set forth by Rock in his report. (Plaintiff's Memo), (Exhibit 9 at 2.) McDaniel determined that Rock's damages calculation appeared to equal the diminution in value of United Coal; however, he noted that no valuation of United Coal was performed prior to Keenan's arrival, or since his resignation. Thus, he opined that a definitive valuation would be extremely difficult to assess. (Plaintiff's Memo), (Exhibit 9 at 2.)

-25-

As mentioned earlier, in Rock's report, his opinion was based on several assumptions, including the assumption that, had Keenan remained at United, he would have been able to successfully obtain third-party financing. As pointed out by McDaniel, on deposition Rock stated that

> I'm not opining on [whether Keenan would or would not have been able to obtain the financing], it's an assumption I've made, I have not gone out to independently verify it beyond the steps that I've done in this case, which is to read the record and all the information I've been provided . . . . So I'm not independently opining on any of these assumptions. That's why they're assumptions.

(Plaintiff's Memo), (Exhibit 9 at 2.) Moreover, McDaniel noted that Rock admitted that, in part, United Coal's ability to obtain investors would be influenced by the coal market and United Coal's coal production capabilities. (Plaintiff's Memo), (Exhibit 9 at 2.)

On deposition, McDaniel acknowledged that he had no experience within the coal industry. (October 2, 2007, Deposition of G. Thorn McDaniel III, ("McDaniel Deposition"), at 8, 133.) McDaniel stated that his opinions were essentially a critique of Rock and how Rock arrived at his conclusions. (McDaniel Deposition at 129-30.) McDaniel recognized that he made no attempt to provide a separate calculation of damages. (McDaniel Deposition at 130.) Likewise, McDaniel stated that he performed no detailed analysis or review of United's financial situation. (McDaniel Deposition at 130-31.) Other than acknowledging that the coal market was declining, McDaniel did not analyze the coal market prior to, or in conjunction with, his report. (McDaniel Deposition at 131.) United's counsel specifically asked McDaniel about his opinion

that "'there has been no evidence submitted that supports United's contention that Keenan is responsible for a 'hypothetical' loss that might occur if [United Coal] is sold at a 'hypothetical' price to a 'hypothetical' buyer that would not cover all of [United Coal's] current outstanding debt to United.'" (McDaniel Deposition at 141.) McDaniel stated that his review of the damages focused on causation and proximate cause. (McDaniel Deposition at 141.) He commented that he "never experienced someone claiming the loss holding the asset [and] not mitigating." (McDaniel Deposition at 142.) In addition, he later testified that United was basically holding Keenan accountable for "whatever they [have] spen[t] money on and whatever they [have] purchase[d]" since his departure. (McDaniel Deposition at 148.)

McDaniel reiterated his opinion that no evidence had been presented to prove that Keenan would have been able to obtain financing to account for the loans United provided to United Coal. (McDaniel Deposition at 149.) He noted that the record showed that the coal market would have impacted the ability to successfully obtain financing, whether Keenan remained at United or not. (McDaniel Deposition at 149.) McDaniel admitted that he did not perform a valuation of United Coal's ability to repay the loans to United. (McDaniel Deposition at 154.) Moreover, McDaniel was questioned as to the reports within the record that showed that coal companies can sell for multiples of five to seven times their EBITDA. (McDaniel Deposition at 155-56.) He recalled that the reports suggested a possible value of United Coal of $400-500 million. (McDaniel Deposition at 156.) Based upon those projections, McDaniel opined that it would be "unfair" to find Keenan liable for approximately $34 million in diminution of value when the company could later sell for the projected price and make hundreds of millions in profits. (McDaniel Deposition at 156.)

-27-

McDaniel was asked what type of scientific, technical or other specialized knowledge he possessed that would assist the jury in determining whether or not United's losses should be attributed to Keenan. In response, McDaniel testified that Rock should have "gone in and looked at other factors external to [Keenan] leaving that could have impacted the value of this company." (McDaniel Deposition at 161.) He asserted that this practice was basic to any valuation. (McDaniel Deposition at 161.) Furthermore, McDaniel stated that the testimony of Zervos, justified his opinion because Zervos noted that the coal market and coal production capacity contributed to any difficulties experienced by United and United Coal. (McDaniel Deposition at 162.) McDaniel stated that Rock's calculation should have considered these factors because they could have an impact on the diminution in value. (McDaniel Deposition at 162.) McDaniel also testified that United failed to mitigate its damages by refusing to rehire Keenan when he offered to return to the company. (McDaniel Deposition at 163.)

## II. Analysis

In general, all relevant evidence is admissible. *See* FED. R. EVID. 402. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. With regard to the testimony of a proposed expert, the Supreme Court has stated that under the Federal Rules of Evidence, the trial judge must ensure that expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Ins.*, 509 U.S. 579, 589 (1993). In determining whether expert testimony is relevant and reliable, the court's focus must be based "solely on principles and methodology, not on the conclusions that

-28-

they generate." *Daubert*, 509 U.S. at 595. The trial courts essentially have an obligation to see that the methodology used by an expert is valid and whether that reasoning can be applied to the facts at issue. *See Daubert*, 509 U.S. at 592-93. The Court set forth certain factors that should be considered when evaluating the admissibility of expert testimony, including: (1) whether the theory or technique used has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within the expert's particular field. *See Daubert*, 509 U.S. at 593-94.

Federal Rule of Evidence 702, as amended effective December 1, 2000, has adopted the principles set forth in *Daubert*, and reads as follows:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The advisory committee note to the 2000 amendment concisely summarizes the appropriate manner for applying these principles. In relevant part, the advisory committee states:

> *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. . . . The Court in

-29-

*Kumho* [*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999),] held that these factors might also be applicable in assessing the reliability of non-scientific expert testimony, depending upon 'the particular circumstances of the particular case at issue'. . . . No attempt has been made to 'codify' these specific factors. *Daubert* itself emphasized that the factors were neither exclusive nor dispositive. Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony.

FED. R. EVID. 702 advisory committee's note. Furthermore, as explained in *Kumho Tire*, the court may consider several factors in a flexible manner depending on the particular circumstances of each case because there are numerous types of expertise. *See* 526 U.S. at 150-51. The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire*, 526 U.S. at 151. "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 153 (citations omitted).

When evaluating motions to exclude expert opinions, the court must examine the proposed testimony to determine whether "the proponent of the testimony [has] establish[ed] its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10.) Expert opinions that are unsupported should be excluded because "nothing in . . . the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moreover, a motion to exclude expert testimony may be successful if the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146.

A. *Keenan's Motion to Exclude*

-30-

Keenan argues that the expert opinion of Rock should be excluded because his proposed testimony is unreliable and speculative. (Defendant's Memo at 9.) To support this argument, Keenan suggests that Rock failed to apply an appropriate valuation methodology and that he relied upon speculative assumptions set forth by United. (Defendant's Memo at 9.) Keenan also argues that Rock's testimony will not assist the trier of fact in assessing the alleged damages. (Defendant's Memo at 9.) Lastly, Keenan contends that "even if [Rock's testimony] is admissible under Rule 702, the at best marginal probative value of Mr. Rock's testimony is substantially outweighed by its prejudicial effect on the jury." (Defendant's Memo at 9.)

First, Keenan points out that Rock failed to rely upon or apply a reputable valuation methodology in formulating his opinion. Keenan notes that the generally accepted methods for valuing a business include: (1) the income approach; (2) the market approach; and (3) the asset-based approach. (Defendant's Memo at 11); *see also* S. PRATT ET AL., VALUING A BUSINESS, THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 46-47 (4th ed. 2000). Keenan argues that although Rock acknowledged these methods on deposition, he nevertheless elected to utilize his own valuation method. (Defendant's Memo at 12.) Keenan contends that Rock chose to treat the purported offers for United Coal as the fair market value of the company. He then identified the investments United had made in United Coal at the time of the purported offers, and essentially compared the purported value of United Coal to the amount United had invested to arrive at a consequential damages calculation of approximately $34 million. (Defendant's Memo at 13.) In calculating this amount, Rock relied on the assumption that, had Keenan remained with United through 2007, he would have been able to successfully obtain third-party financing and, thus, would

-31-

have eliminated United's debt. However, on deposition, Rock admitted that he did not independently verify the assumption set forth by United. (Rock Deposition at 58.)

Keenan asserts that the purported offer that was used by Rock in his valuation of damages was not an offer to purchase United at its highest value. (Defendant's Memo at 13.) Instead, Keenan argues that the value assigned to United Coal was actually the amount United planned to contribute to the purchase of a certain Central Appalachia coal company. (Defendant's Memo at 13.) Apparently, United had intended to partner with another company in an attempt to purchase this Central Appalachia coal company, with plans for United Coal to become a part of the new company. (Defendant's Memo at 13.) During these discussions, a private equity group suggested a $210 million value for United Coal. (Defendant's Memo at 13.) Based upon this information, Keenan argues that United never actually offered to sell United Coal and that the private equity group did not make an actual offer to purchase United Coal. (Defendant's Memo at 13.) Thus, Keenan argues that there was never a willing buyer ready to pay a certain amount to purchase United Coal. (Defendant's Memo at 13.)

Furthermore, Keenan argues that Rock failed to consider other factors that may have impacted United's ability to obtain financing. (Defendant's Memo at 13-16.) Specifically, Keenan argues that Rock did not properly consider factors such as other valuations of United Coal and the volatility of the coal market and how it impacted United's ability to attract investments. (Defendant's Memo at 14.) Keenan notes that Rock relied on what he labeled "real offers" from "real buyers" that were willing to close the deal. (Rock Deposition at 170-72.) However, Keenan contends that there is

-32-

no precedent for using "rejected" offers to establish a business's fair market value. Thus, because Rock failed to consider certain crucial factors which may have altered his calculation of damages, Keenan argues that the data he used was speculative and unreliable. (Defendant's Memo at 13-16.)

In determining whether Rock's proposed expert testimony will be admissible, the court must examine the reliability of Rock's analysis and opinions. *See Daubert*, 509 U.S. at 592-93. It must be noted that, at the November 13, 2007, hearing, United's counsel was unable to identify a single case in which an expert employed the methodology utilized by Rock in valuing a corporation.[2] Similarly, United's counsel also failed to identify any scholarly work recognizing the methodology used by Rock. In response, United contends that the Pratt text, which was previously cited by Keenan, explains that "[d]ocumentable, arm's-length, bona fide offers to buy or sell may also be useful evidence of value." PRATT at 274. Despite this language, I am of the opinion that United's reference to the Pratt text is misplaced. First, the language merely states that an arm's-length deal may be used as "evidence" of value. United fails to point to any relevant language that stands for the proposition that a "documentable, arm's-length, bona fide offer" can be used as an accepted valuation method. Second, and most importantly, I am not convinced that this purported "offer" was an arm's-length

_____

[2]Although United was unable to produce any authority supporting its contention that Rock utilized a proper business valuation method at the November 13, 2007, hearing, on November 16, 2007, United submitted supplemental authority in support of its opposition to Keenan's motion to exclude. (Docket Item No. 132.) After reviewing the supplemental authority provided by United, in addition to Keenan's Reply to Plaintiff's Submission of Supplemental Authority, (Docket Item No. 146), I am of the opinion that the supplemental authority fails to identify a situation where business value was calculated using solely purchase offers. Instead, the authority simply recognizes the principle that a purchase offer may be useful evidence in determining a business's value.

offer that was truly based upon the value of United Coal. Instead, based upon the evidence presented, the amount United claims was an offer appears to actually be the amount that was to be paid towards United Coal's debt to United in a transaction where United was attempting to purchase a Central Appalachia mining company in conjunction with another company. Therefore, I am of the opinion that the purported offer did not provide an accurate estimation of United Coal's value; it simply reflected the amount that would cover United Coal's debts to United.

Furthermore, in researching the various methodologies used in the valuation of businesses, I concur with Keenan that there are three generally accepted methods, including the income approach, the market approach and the asset-based approach. *See* PRATT at 46-47; *see also Hoffman v. Vecchitto*, 235 B.R. 231, 236-37 (Bankr. D. Conn. 1999) (the experts agreed that the three methods were generally used to determine the fair market value of stock in a company); *Berens v. Ludwig*, 953 F. Supp. 249, 253 (N.D. Ill. 1997) (used the three methods in the valuation of a shareholder's stock). United does not contest the fact that these methods are generally accepted; instead, United contends that Rock rejected the use of each of the methods and chose another method of valuation. However, there is nothing within the record, nor within a search of business valuations methods, that suggests that Rock's methodology is generally accepted and reliable.

The court recognizes that, on deposition, Rock acknowledged the three accepted methods of business valuation. However, as evidenced by his testimony on deposition, he ignored the accepted methodologies and chose to formulate his own approach to value United Coal. (Rock Deposition at 170-74.) This court has a gatekeeping

-34-

obligation to ensure that the methodologies used by experts are valid and to determine whether the reasoning an expert follows can be appropriately applied to the particular facts of the case. *See Daubert*, 509 U.S. at 592-93. Here, Rock failed to base his proposed testimony upon reliable principles and methods; thus, Keenan's motion to exclude shall be granted as to Rock's opinions regarding United's alleged damages as they relate to his valuation of United Coal. Because the court has excluded Rock's testimony as to the above issue, the undersigned notes that there is no reason to address Keenan's remaining arguments relating to the date used for measuring United's alleged consequential damages; the causation of United's alleged consequential damages; or that the probative value of Rock's testimony is substantially outweighed by the danger of unfair prejudice.

Rock also opined that it was not uncommon for entrepreneurs to engage in handshake deals in the ordinary course of business. (Defendant's Memo), (Exhibit H at 6.) In addition, Rock stated that United's tax treatment of the $10 million incentive bonus was "governed more by tax considerations than the substance of the transaction." (Defendant's Memo), (Exhibit H at 6.) However, the undersigned entered an order dated May 9, 2007, granting United an extension to produce its expert reports "on the issue of damages." (Docket Item No. 43.) Specifically, United was given until May 23, 2007, "to identify an expert and file an expert report addressing the subject of United's claim against Keenan for consequential damages." (Docket Item No. 43.) Rock was retained to "review and analyze damages incurred by [United] related to [the] action of [Keenan]." (Defendant's Memo), (Exhibit H at 1.) Thus, Rock's opinions as to the tax treatment of the incentive bonus and the customary practice of handshake deals are outside the scope of what was set forth in the order

-35-

granting United's extension of time. Therefore, Keenan's motion to exclude shall be granted as to these opinions.

## B. United's Motion to Exclude

United seeks to exclude the proposed expert testimony of Alan Johnson, Seth Schwartz and G. Thorn McDaniel III. With regard to Johnson, United argues that the entirety of Johnson's expert report should be excluded because his proposed testimony fails to "fit" the facts of this case, and that it would likely mislead the jury. (Plaintiff's Memo at 10, 14-17.) In addition, United argues that Johnson's proffered testimony simply amounts to legal conclusions drawn from readily understandable facts. (Plaintiff's Memo at 11-14.) Johnson opined that it would be "extremely unusual and unprecedented" for a company such as United to attempt to recoup an incentive bonus that was allegedly based upon future employment without that agreement being in writing. (Plaintiff's Memo), (Exhibit 3 at 3.) He explained that it is customary for companies to reduce deferred compensation agreements to writing, especially those that delay/stagger the payment in order to ensure employee retention. (Plaintiff's Memo), (Exhibit 3 at 3.) He also noted that United should have been aware of this common practice within the industry because United itself had previously used a company-wide deferred bonus program that was in writing. (Plaintiff's Memo), (Exhibit 3 at 4.) Thus, based upon this information, Johnson determined that it was unreasonable to require an employee to remain employed for a certain period without that agreement being documented in writing. (Plaintiff's Memo), (Exhibit 3 at 4.)

Based upon Johnson's experience as an executive compensation expert, I am of

-36-

the opinion that his testimony as to customary and usual business practices, as they pertain to deferred compensation agreements and whether such agreements are generally in writing, would be helpful to the trier of fact. *See* FED. R. EVID. 702. Specifically, the issue of whether it is reasonable for a company to rely upon an employee's promise to remain employed at the company for a certain period of time is particularly relevant to the issue of equitable estoppel, which is of much importance in the case at hand. In *Nargi v. CaMac Corp.*, 820 F. Supp. 253, 257 (W.D. Va. 1992), the court examined the reasonableness of the plaintiff's reliance on certain representations. In *Nargi*, the plaintiff alleged that, during negotiations with a potential employer, he made it clear that he would need a guaranteed term of employment of at least four years. *See* 820 F. Supp. at 254. The plaintiff claimed that the employer made several statements that indicated he would be with the company for the long term. *See Nargi*, 820 F. Supp. at 255. Accordingly, this court is of the opinion that Johnson's testimony as to the reasonableness of United's reliance, as it relates to the customary practices used in the business world, would be of great assistance to the trier of fact. For the reasons stated above, United's motion to exclude will be denied as to this particular line of testimony.

Johnson also stated that it was unreasonable for United to invest hundreds of millions of dollars in the coal business based upon the assumption that Keenan would remain with the company for at least five years. (Plaintiff's Memo), (Exhibit 4 at 3.) This opinion is problematic, as it does not appear to fall within Johnson's field of expertise. He is an executive compensation expert, not an expert on the reasonableness of certain business ventures and investments. At the hearing on these motions, Keenan's counsel conceded that Johnson was not qualified to offer an opinion as to

-37-

United's decision to continue its coal business plan. Thus, the court will grant United's motion to exclude as to this opinion.

On deposition, Johnson discussed the reasonableness of the alleged agreement between Keenan and United. Johnson openly questioned the agreement and indicated that it was questionable whether the alleged agreement was either "reasonable" or "even plausible." (Johnson Deposition at 66.) This is simply an opinion on the weight of the evidence and the credibility of United's version of the facts. A determination as to the weight of the evidence and the credibility of the alleged facts are issues for the trier of fact to decide. *See United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995) (standing for the proposition that a witness's credibility is a determination left for the jury to make). Thus, Johnson's testimony as to the plausibility or reasonableness of United's allegations shall be excluded.

Lastly, Johnson stated that, based upon the customary practices within the business world, executives have the right to terminate employment voluntarily and not be held liable for hypothetical losses that occur after their departures. Although Johnson is clearly qualified to offer testimony as to the customary practices in the business world, I do not believe opinion testimony is necessary as to the ultimate issue before the jury – whether Keenan had a right to terminate his employment without any obligation to repay the $10 million bonus he had received. Thus, because Johnson's proposed testimony as to this issue does not amount to "scientific, technical, or other specialized knowledge" that would be of assistance to the trier of fact in understanding the evidence "or determin[ing] a fact in issue[,]" United's motion to exclude will be granted as to this testimony. FED R. EVID. 702.

-38-

United argues that Johnson's opinions fail to "fit" the facts of the case, as required by *Daubert*. *See* 509 U.S. at 591-92. Specifically, United contends that Johnson's expertise does not fit the facts in the case at hand because the majority of his experience as an executive compensation expert is with "large public companies." (Johnson Deposition at 43.) The court recognizes that United is a private, closely-held corporation. However, I am not persuaded that this distinction renders Johnson unqualified to present testimony in this case. While Johnson admitted that he mainly works with large public companies, he also noted that he has consulting experience with private companies as well. (Johnson Deposition at 43.) Accordingly, I find that Johnson's experience is relevant to the case at hand, and that there is a valid connection between Johnson's experience and the disputed facts. *See Daubert*, 509 U.S. at 591-92.

United also asserts that certain portions of Schwartz's expert opinion are improper, as they are legal conclusions drawn from readily understandable facts. (Plaintiff's Memo at 17-18.) In Schwartz's supplemental report, he opined that "[t]here is no reason to believe that Mr. Keenan would have done any better than [United] did in obtaining financing." (Plaintiff's Memo), (Exhibit 6 at 4.) This opinion appears to address the weight of the evidence that has been presented. It should be noted that United has presented sufficient evidence to support its contention that, due to Keenan's expertise in financing, United believed that it would have been able to successfully obtain third-party financing had Keenan remained with the company. At the November 13, 2007, hearing on the cross-motions to exclude, Keenan's counsel conceded that Schwartz's phrasing of that particular opinion was improper. Thus, the court hereby grants United's motion to exclude as to that

particular statement.

Schwartz also offered an opinion as to whether or not United properly mitigated its alleged damages. Specifically, Schwartz determined that United failed to mitigate damages because it did not make an effort to hire an executive capable of replacing Keenan. (Plaintiff's Memo), (Exhibit 6 at 4.) Schwartz found that, instead of mitigating, United chose to continue to invest large sums of money into the coal business in an attempt to realize profits. (Plaintiff's Memo), (Exhibit 6 at 4.) However, on brief, and at the November 13, 2007, hearing, Keenan's counsel conceded that "portions of Mr. Schwartz's mitigation testimony cross[ed] the line into argument, and agree[d] to withdraw" his testimony as to that issue. (Defendant's Brief in Opposition at 18.) Therefore, the court will grant United's motion to exclude as it pertains to Schwartz's conclusion that United failed to mitigate.

United argues that McDaniel's proffered testimony also should be excluded because his testimony is not based upon scientific, technical or other specialized knowledge. (Plaintiff's Brief at 18-19.) Moreover, United argues that McDaniel's expert opinion is unnecessarily cumulative. (Plaintiff's Brief at 19-20.) At the outset, I note that McDaniel's proposed testimony as to the tax treatment of the incentive bonus is well within his expertise and would be of assistance to the trier of fact. *See* FED. R. EVID. 702. Thus, McDaniel's testimony as to that issue shall not be excluded.

In his supplemental report, McDaniel offered an opinion as to Rock's damages analysis. He opined that Rock's computation of damages held Keenan responsible for all of United Coal's debt to United that was not covered by a hypothetical buyer. In

-40-

addition, McDaniel determined that it was unfair to hold Keenan responsible for damages that are based on a diminution in value when United Coal could later sell for a very substantial profit. McDaniel's expertise in forensic accounting and the computation of economic damages clearly entitles him to testify as to the Rock's calculation of damages. Therefore, the court will deny United's motion to exclude insofar as McDaniel's testimony relates to Rock's damages calculations.

However, in his supplemental report, McDaniel opined that Rock failed to make necessary adjustments for the prices of coal and coal production ability when valuing United Coal. (Plaintiff's Memo), (Exhibit 9 at 2.) He pointed out that Rock's calculation appeared to equal the diminution in value of United Coal, but opined that, based upon Rock's failure to perform a valuation of United Coal prior to Keenan's employment at United and since his departure, it would be extremely difficult to arrive at a definitive valuation of United Coal. (Plaintiff's Memo), (Exhibit 9 at 2.) McDaniel testified that Rock should have evaluated other factors, external to Keenan's leaving the company, that could have impacted the value of United Coal. (McDaniel Deposition at 161.) At the November 13, 2007, hearing, Keenan's counsel acknowledged that McDaniel was not offered as an expert in business valuation. Thus, based upon this concession, I will grant United's motion to exclude any testimony offered by McDaniel regarding Rock's valuation of United Coal.

McDaniel also offered testimony as to the weight of the evidence in this case. In particular, he stated that no evidence had been submitted to support United's contention that "Keenan is responsible for a 'hypothetical' loss that might occur if [United Coal] is sold at a 'hypothetical' price to a 'hypothetical' buyer that would not

cover" United Coal's debt to United. (Plaintiff's Memo), (Exhibit 9 at 2.) Similarly, he opined that United had failed to prove that Keenan would have been able to secure sufficient financing to offset any loans provided by United. (Plaintiff's Memo), Exhibit 9 at 2.) These statements are not appropriate as expert testimony. Each of these purported opinions go to the weight of the evidence. Moreover, he determined that United had failed to properly mitigate its damages because it did not attempt to replace Keenan or accept his offer to return to United. (Plaintiff's Memo), (Exhibit 9 at 2.) As stated above, the court will exclude McDaniel's conclusion that United failed to mitigate.

United argues that McDaniel's testimony is unnecessarily cumulative, as it is duplicative to the proposed expert testimony of Schwartz. This argument has no merit. Schwartz's opinions are based on his experience within the coal industry and address the valuation of United Coal. Conversely, McDaniel has offered relevant testimony as to the tax treatment of the incentive bonus and also provided analysis as to Rock's calculation of damages. Therefore, the court sees no reason to exclude McDaniel's testimony as cumulative. Instead, McDaniel's testimony provides an additional perspective from an expert in a different field.

### III. Conclusion

Accordingly, Keenan's motion to exclude Rock's proposed expert testimony will be granted in part and denied in part. Likewise, United's motion to exclude expert testimony will be granted in part and denied in part. An appropriate order will be entered.

-42-

DATED:     This 30th day of November 2007.


/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE